The second case on our docket this afternoon is 21-60593 Pie Development LLC vs. Pie Insurance Holdings Incorporated. Mr. Kimball. Yes, Your Honor. May it please the court. Thank you for having us this afternoon. As the panel is likely aware, this is a trade secret case. It was dismissed based on the basis of the pleadings based on the defendants rule 12b6 motion. The motion was pending for about a year and four months after the briefing closed. We petitioned this court for writ of Vandamus and within 24 hours the district court dismissed all of our claims. And the basis for that dismissal, again, was because the court concluded that we had not adequately pled our claims. The two topics I'd like to cover this afternoon is number one, whether we adequately pled a trade secret, and number two, whether we adequately pled that reasonable measures were taken to protect the secrecy of the trade secret. At the outset, I'd like to note, and because this is maybe the most important point, that there's no real dispute that the heightened pleading standards of Rule 9a do not apply here. These claims are governed by the Rule 8 notice pleading standards. And just to kind of state first principles in this instance, the Rule 8 obviously, as the panel is aware, requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Each allegation must be simple, concise, and direct. No technical form is required. It is important to note that the defendants, many of the authorities that the defendants cite, and I would say most of the authorities the defendants cite to attempt to demonstrate that these items were not adequately pled are either summary judgment motions or motions for injunctive relief that had with it an evidentiary hearing. That's what a lot of these opinions relate to. Not all of them, but many of them. And we believe that is telling because when the opinions are reviewed that actually address Rule 8 notice pleading requirements for trade secrets, what was pled here obviously meets that standard. On the issue, particular issue of whether a trade secret was properly pled in this instance, I would like to first point out that this complaint is 98 paragraphs long. It contains names, dates, places, what was said, when things were said. We would contend that even though Rule 9 doesn't apply, this exceeds Rule 9 pleading requirements. And if I may, Your Honor, if the panel will indulge me, the meat of the trade secret that was alleged is contained in the record at 12. And I'd like to go through just a few of those allegations if I may. What is alleged in the complaint is a trade secret that was a business plan that is known in the complaint as the pie trade secret. And quoting directly from the complaint, it was to create an application available on the internet and on smart phones to make purchasing workers' compensation insurance quote as easy as pie. Now, even the defendants as a side note stole the name, the application, and even the slogan down to those very words. I have a question about that. Let's suppose we substitute auto insurance, life insurance, commercial liability insurance. What makes that a trade secret? I mean, there's an app for buying just about everything on the internet. What is it just by saying I want to create an app to buy X that makes it a trade secret? Right. Because this involved a plan not just of purchasing insurance on the internet, and I know the defendants want to characterize it that way. This was an application, the whole idea behind the application is to use a very small number of data points to provide, instantly provide, a workers' compensation insurance quote and the insurance agent would not even be interested. You could say the same thing about general liability policy. Small number of data points. What makes that global kind of overarching idea a trade secret? I think at the time this trade secret was misappropriated, it wasn't as ubiquitous as that in terms of the ability to purchase insurance in that way. The trade secret was first revealed to the defendants in early 2016. Now, whether or not that sort of an application was ubiquitous at that time and was known to anyone, that I would contend would be something that the defendants at trial can put on an expert in the insurance industry, particularly the workers' compensation insurance industry, and he could testify about that. But we do not believe, at the time the trade secret was misappropriated, that such applications were so ubiquitous in the market. And if I may just move on with the, if I've answered your question, your honor, I'll move on with the allegations. There's only a few more. So is the answer to Judge Richmond's question that you've alleged a trade secret and you don't have to prove definitively today that it is one? Or what is it that you're saying? Correct. I think what I'm trying to say today is we alleged enough to indicate there was a trade secret involved here. Yes, that this is a question of pleading. And as this court has said, this court has been fairly liberal in its, in the pleading of trade secrets. In the Tuareg case, which we cited in the briefs, this court has said that a trade secret is one of the most elusive and difficult concepts in the law to define. And the court goes on in that case and states that the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of the evidence from each side. And the idea, your honors, that this was a unique idea at the time, the way the trade secret was supposed to work, the pie trade secret was supposed to work, is that after the defendant misappropriated the trade secret and we attached all of the relevant documentation to our complaint, they were able to raise over $60 million in capital on this idea. So this idea was good enough and it was unique enough that there were investors, big time investors, as we describe in the complaint, that were willing to pay a lot of money to see this trade secret come to fruition. I was going to change the subject, sir. Oh, I was going to ask you about that as well. What you say in paragraph 17 of your, I'm sorry, 27 of your complaint, is that as you describe the trade secret as using minimal information that would access various available data sources, nothing secret about those, to provide workers' compensation quotes. I mean, this is all available information, it seems to me, and you don't allege in there that people pay $60 million for just that general concept. And the other thing is, raising capital does not mean profits. No, I agree, your honor. Raising capital does not mean profits, but the individuals who invested the $60 million in this idea wouldn't have done it without the idea that it would generate profits. Well, they were hopeful, of course they were hopeful there would be profits. You haven't alleged that anybody made any money off of this. Yeah, they raised capital. What was the gain or the loss on that capital? Yes, your honor. And I think, you know, at this sort of nascent stage of the litigation, there was no requirement in the pleading standards for me to allege that the amount of profit these investors would have made off of the idea, only that there were sophisticated institutional investors that thought there was enough possibility of profit to inject that much capital into the venture. And I do think, and again, reiterate this point, this concept that was alleged in the complaint was so unique at the time they were able to find investors such as this. If anybody could have done it anywhere, I don't think they would have gotten that concentration of capital. Well, you don't even allege that. You don't allege that this concept was so unique and that this concept alone that you use minimal data points and various available data sources to provide workers compensation quotes. Well, you don't say that was so unique that $65 million of capital was raised. We don't know what else went into the formula that raised the capital. You don't say that was all it took. And I would say at the pleading stage, that was not required by the authorities that we've indicated. In truth, your honor, let's assume that is the case, that the technologies involved here were present within the insurance industry at the time. I would say that that wasn't the case and that wasn't what we alleged. There you have it. You put your finger on it. What technology did you have that was not available to the industry or your client? Exactly the technology I'm describing. The ability to, without an insurance agent, take a small number of data points and using various analytics, come up with a profitable level of premiums that would be paid by the employer. What technology do you allege in here that was shared with the defendants? What is it? What technology? Not just the minimal data points, various available data sources. What technology was it that was shared? I would say the combination of those. The analytical systems underlying it and the use of these publicly available databases combined with those analytics. So you did have analytical systems? You did have those? Yes, your honor. And this was, and to be sure, and to show you what maybe a difficult process this was, the consulting firm, Valin, which was owned partly by defendant Dax Craig, they spent probably, I believe, over two years trying to develop this application. And so it wasn't something that you could just pick out of the air. This was something that was difficult to do. And it is alleged in the complaint, the timeline and the amount of effort that went into trying to develop this application. And one other quote. How much did your client pay to develop that? I do not have that number off the top of my head, the amount of effort, but I know it was paying a fairly highly respected consulting firm for literally a couple of years to try to develop it. And one more point, and I think this sort of is going down the line of your questioning, your honor. Again, in the Tuareg case, this court said that we have specifically rejected the contention that a combination of disclosed technologies cannot itself constitute a trade secret. So that is the fact that we may have been combining things that were known in the market, and I believe some of the things weren't known in the market, but even if it were, that does not a priori indicate that this did not qualify, this business plan did not qualify as a trade secret. I would say if you had a unique business plan doing something as mundane as selling lemonade, if it was a unique business plan with a unique marketing strategy, a unique way of approaching it, even selling lemonade could constitute as a business plan that would qualify as a trade secret. Mr. Kimball, if we disagreed with you about whether or not there's enough meat on the bones here, have you asked to plead, to replete, and what does the law say about whether you should be allowed to replete? We do, and this is a very practical answer, due to the time it took for the court to decide the Rule 12B6 motion, I believe 16 months after the pleadings closed, and the fact that we believe our pleadings were more than sufficient, we had chosen to go ahead and appeal to this court. I believe if this court decides, and we've asked for this, if this court decides that more is needed in the pleadings, that this court can grant that relief. Would there be able to get more, or is it futile? Your Honor, there are more facts that could have been pled, yes. We relied on the simple language of Rule 8, and believe we went well beyond that, but in the course of the two years that Valin helped or worked with us to try to finally develop this trade secret, there were obviously a lot of communication and information that was sent to Valin. Can we talk about the reasonable measures that you took to protect the secret, assuming that you've got one? I have a question for you about the NDA, but before we get to that, is there anything beyond the NDA? Yes, Your Honor. We cited several authorities which held that this duty to maintain the secrecy of the trade secret, even beyond the NDA, is something that could be implied by the circumstances. You have a situation here, if we want to reflect on what the situation was here, and this is all pled in great detail in the complaint. The initial meeting about the pie trade secret occurred in May 5th of 2016, and the circumstances was this. You had two highly placed insurance executives, a CEO and a chief underwriting officer, that met with two highly placed Valin consultants. One of those is Defendant Dax Craig. He was the president of Valin. A lot of the authorities we cited would indicate, well, of course, Mr. Craig, you knew at this meeting when they were revealing to you this trade secret, this business plan, this application that had not yet been revealed to the public, you knew you were under a duty as a consultant not to go out and steal the trade secret, and even before your engagement entered, start your own company with the same name, with the same slogan, and the same idea. So I would say that that is step one. I'm asking a slightly different question, and I just want to make sure that you hear it. You can answer it however you want, but I just want to make sure we're on the same page. I'm not asking about the duty to protect the information. I'm asking what reasonable measures did your client take to protect it beyond the NDA? Beyond the NDA? Yeah, what we alleged in the complaint that internally, and this is in the complaint in the record at 16, that internally knowledge of the pie trade secret was limited to a small group of AMFED executives who were aware of the requirement to, and did, keep the project secret. So it was an internal policy to limit knowledge of it to a very small number of executives that was known, and that they did keep it secret, other than the NDA. But then there also is the NDA. Could you tell me, when you talk about Mr. Swigert, I think it is, you say that he willfully and maliciously appropriated it. What facts do you have to back that up? That while he was still working on the pie trade secret for my client, at the same time, he was doing that and getting... Swigert? Oh, I'm sorry, Mr. Swigert, my apologies, I thought you meant Dax Craig. Mr. Swigert, in terms of his knowledge that the trade secret had been misappropriated, I think a decent guideline is Rule 9. Even though Rule 9 doesn't apply here, that it is informative to look at it. Because even under the heightened pleading standards of Rule 9, states of mine, and knowledge is listed specifically, can be pledged generally. Alright, you've saved some time for rebuttal. Mr. Gershenson? Good afternoon. May it please the Court, Adam Gershenson for Appalese. Thank you for your flexibility also when I was ill. Much appreciated. This case has a single dispositive question. Did the appellant's complaint meet the pleading standard to state a claim for theft of a trade secret? So the district court did exactly what Chief Judge Richman did, which went to the actual allegations, specifically paragraphs 24 to 33. And the district court rightly held that it didn't suffice. And a big part of the reason it did not suffice to state a claim was because the complaint never distinguished between what was generally known or reasonably ascertainable. And that's the pleading standard as embraced in American Biocarbon, the Bureau Veritas case that we provided, and the Vendato case, which is just one of many dismissal cases cited in that American Biocarbon decision. So with my time today, if I may, I'd like to address just quickly what's in the complaint, number one. Number two, what's not in the complaint. And number three, to the judge's point about the decision to amend and the failure to amend. So what's in the complaint? Well, these requirements come directly from the statutes, DTSA 1839.3 and MUTSA 7526.3. This requirement about distinguishing from what's generally known or reasonably ascertainable. The appellants themselves admit in record 114 what, quote, must be shown is the information derives independent economic value from being not generally known or readily ascertainable. And here, under that prevailing standard, they failed to state a claim. So we look at the complaint, just as Your Honor did, and saw it's insurance on an app using, quote, minimal information, quote, a few data points from various available sources in a few minutes, and they have a marketing slogan, easy as pie. The district court noted all of that at the record at 205, and again at 212 and 213, and concluded at AR 211 that courts, quote, routinely dismiss such claims for failure to distinguish between what's generally known or reasonably ascertainable. It's as if I walked in here and said, I'm going to build an autonomous car, I'm going to build it fast, it's going to ride fast, and we're going to have a slogan built for speed. Not a trade secret, because I have not distinguished to anyone in the industry what's my secret, purported secret, from what's generally known or reasonably ascertainable. So if I may, the second point is what's not in the complaint? Well, there's no breach of contract claim, and in fact, in their opening brief at 37, I'll quote appellants, high development has not alleged that there's a contract between high development and any of the appellees. And that may be what Judge Oldham was going at, although happy to hear otherwise. It's not even a contract with the parent company of appellees, because if you look at Complaint Paragraph 1 in Paragraph 9, it's actually the reality that there's AmFed holding company up here, then over here, there's high development, and all the way over here, separate entity entirely, is this AmFed that they put in quotes throughout the papers. Now, AmFed over here apparently had an MDA with Valen, another company, another contract about another business, but that doesn't apply. I think you mentioned the lemonade stand. If you have an MDA about one restaurant with one company and another company comes to you to discuss a lemonade stand, that's not covered, particularly not when the contract by its terms says it's not assignable. So throughout the papers, we hear, well, it's not foreclosed the possibility of all sorts of other things, but that would subvert the pleading standard. Pleading standard says appellants had to provide the facts to make the claims plausible, but there was no statement that the MDA covered this notion, no allegations of any steps at the industry breakfast to preserve confidentiality in terms of reasonable measures, as was asked. There's no allegation that meeting lasted for hours, and there's no explanation whatsoever of why they created a purported trade secret this way, either at a convention breakfast or after they purportedly saw it used in Las Vegas and then waited two years and never sent even a cease and desist, never moved for preliminary injunction, never did anything. So what's allegedly taken in this complaint? Well, what's not there again? No documents were taken, no code, no algorithm. There's no identification of what, quote, information, what, quote, data points or sources were taken. And there's certainly no identification of techniques, processes, and procedures, which is what appellants keep referencing in their papers. What else is missing? Well, there's no identification of any customers lost or even competed for. The complaint, paragraphs 14 to 18, is the entirety of their supposed business efforts. They got a Dun & Bradstreet number, a certificate of information, and a placeholder app. That's not what people invested. Investments came up. You don't get $60 million for that. You get that for management, for execution, and strategy. There's also zero hires mentioned in the complaint, no software development of any kind. I think we heard for the first time today, oh, we have an analytic technology. That's definitely not in the complaint. If that's not in the complaint, then why shouldn't they be allowed to amend to put that in the complaint? Because that would certainly be really notable. Well, what this court's precedents, particularly in Lopez Dominguez, said is that it's an either-or choice. You heard my brother say, we chose to appeal instead. The reason it's an either-or choice is because a motion to dismiss with leave to amend is not appealable unless the party disclaims any intention to amend. The NAC and case, N-A-Q-U-I-N, says the same thing. That makes perfect sense because otherwise, they come up to you. You say you can amend. They go back down. They amend, get dismissed again, come back to you. The weakest cases end up coming and getting two Fifth Circuit appeals before they're even passed the motion to dismiss stage. That's not what the federal rules auger. It's not what they recommend when they talk about efficiency and fairness for that matter. This case wasn't efficient to begin with, though, so we can't be saying that it might have some other incidental inefficiency. Are you saying that our case law prohibits us from granting leave to amend here? I thought we were encouraged to have leave to amend. I think certainly the district court is encouraged to have leave to amend, which is exactly what happened here, and parties are then encouraged to take advantage of that leave to amend. That's the proper path. They had 30 days to amend, and the district court gave a very, very specific roadmap of what's missing. There was no mystery here, but they chose not to amend, and that's the third piece of the argument. They chose not to amend to show which facts show that this supported trade secret was not generally known or reasonably available. They never amended to say that, oh, we indicated the conversation was confidential. They never amended to give a different theory of unjust enrichment or conspiracy, and they haven't even put in their papers any proffer of what they would amend. If Paula Twombly says use judicial experience and common sense, what does your judicial experience and common sense say about whether they could have filled those gaps when they had the roadmap and they declined to do it? They say, well, oh, but it took 14 months, of course, during COVID to do this, but that's not a viable excuse or good cause. It took them two years to sue. They've done absolutely nothing to show that anything was urgent. So that mere time passage was not an excuse, and what they got, we'll say from the district court, was a 23-page reasoned opinion, and it even sided with the appellants on certain issues, including preemption and giving them leave to amend. There was no door being slammed in their face. There was no sense they had no opportunity. They had the right to amend. They had leave, and they failed to do it. Mr. Gershenhorn, can you answer the question about whether or not our case law either precludes or encourages? So the answer is, I look at Lopez Dominguez, and I can't say that it encourages you to give the right to amend again when it was already blown off, for lack of a better word. Right? The question is supposed to be... Did you say that we're precluded? Are we precluded from doing so? I cannot say, based on the case law that I've seen, that you are absolutely precluded from doing so. All I've seen is, because I don't think this question comes up typically, because parties take advantage of the leave to amend, or they appeal. That's what Lopez Dominguez says. It's one or the other. So I just think if we focus on what's actually in the complaint and what is not in the complaint, the district court was correct in dismissing, and that decision should be affirmed. I'm happy to address... I think the Swigart issue came up as well. So for that issue, the Navigation Holdings case, which was cited in American Biocarbon, says you've got to have facts, which I believe was Judge Richmond pointed out. You've got to have the actual facts, and you've got to relate to each defendant. So what the district court said there at 218 was, there's no factual basis for the assertion that Swigart knew that Craig had allegedly misappropriated the trade secrets. And again, they didn't amend, and on that one, they didn't even appeal. If you look at Appellant's opening brief at 21, in terms of the issues raised on appeal, they were all about what Mr. Kimball started out with today. It was all about whether they failed to identify trade secrets, which we agree they did, and whether they failed to take reasonable measures, which we agree they did. There was nothing in that appellate brief about misappropriation in their opening brief, much less anything about Swigart in particular. So that's been waived. There was no legal argument or authority, and the other claims are really derivative of this trade secret piece. I'm happy to address questions on any other issues. Thank you, Counselor. I'm sorry. Is Craig and his consulting team the persons who provided the predictive analytical services, which were worked on for two years? That's mentioned in the complaint, isn't it? So let me just look so I'm exact. I don't want to misstate anything as I look at the exact record. So what I see is Valen performed its predictive analytic services well. So that was 36. And this is what I was trying to get at, that there's actually they're trying to conflate two different projects here. So apparently Valen was doing predictive analytic services that may have been under the MNDA or what have you. And then they say Valen did not perform its services related to the Pi trade secret satisfactorily. Now, that's wholly conclusive. We have no idea what they're talking about there, but that's the divide there. It's not the case that there were technical analytics being done, at least according to this complaint, by Valen or anybody else, you know, working, toiling, doing code. There's not a hint of code anywhere in this trade secret claim. It's all about an abstract notion that they now want $60 million. What are predictive analytic services in this context? So I believe that would be in terms of their risk capabilities, risk assessment for the insurance company. Nothing to do with this other piece about the workers' comp, to my understanding. Even in the complaint, they seem to separate them, right? There's the analytic services over here and the trade secrets over there. That's how I read 36 and 37, Your Honor. We can't really tell that, can we? I mean, I can't tell from the face of the complaint what they're trying to say here. I certainly don't get that there were two different projects. Okay, so here's what I take as the inference. 36 says, Valen performed its predicted analytic services well. So there's your predictive analytic services piece. And then number 37, Valen did not perform its services related to the pie trade secret satisfactorily. So the clear implication there is that the predictive analytic services were not related to the pie trade secret. And that makes sense because they've nowhere talked about the trade secret having anything to do with analytics, code, algorithm, or anything of that sort. Well, they say in paragraph 34 that Valen agreed to provide the predictive analytic services discussed at the May 5th meeting, as well as consulting services that would help pie development create pie. That seems to me pretty clear what they're talking about. And I take it from 36 that they did perform the predictive analytics well, and then they took that and created their own product. So I don't think there's any way to say that based on this. I mean, they described the trade secrets really at 24 to 33, and there's no mention of this predictive analytic services. So it is possible that there are multiple pieces, but none of this is saying that there was any code taken or anything else. If they wanted to make that allegation, that should have been in here from the start. And certainly when the district court said, wait, you haven't named any trade secret, they could have readily said, oh, wait, okay, let us be clear. Here's what was not generally known in the industry, and it was our method for identifying X, Y, or Z. But that didn't happen here. It's not the record we have, Your Honor. But you agree, though, that you could take a combination of things that are known, and that would be a trade secret, right? It doesn't have to be – you know, it could be the specific combination. It does not have to be – you don't have to have some secret code. You could just take things that are known, but it's the use of them together that makes that a trade secret. The answer is, as a categorical matter, yes, one can have combination trade secrets. That's not this case. Here, right, when you say a few data points, minimal information, various available data sources, none of that is secret, and nor is the combination secret. And there's no allegation, right? They're trying to flip it on its head by saying, oh, at trial they can tell you that it was known all over the industry, that GEICO was doing it and everyone else was doing it. But the problem is they have to allege that here from the beginning, that it was not generally known. So, you know, what the DTSA says and MUTSA says is there are all these forms of trade secrets, categories, to your Honor's point. You know, yes, a combination is a category of trade secret, but it's only a trade secret if – and this is in the definition in both statutes and in the American biocarbon case – if it's not generally known or reasonably ascertainable, and that's what they had to plead and that's what they failed to plead. So, but Mr. Roberts had access to the information because of his work, correct? Well, Mr. Roberts is president of AmFed and has nothing to do with defendants, just to be clear. I'm not sure. Well, that's not true because he told the other people. I just want to make clear that Mr. Roberts had access to all of this and he learned the pie name and all of the information at the May 5th meeting, right? As I understand it, Mr. Roberts probably – I mean, it's not clear, candidly, from the complaint, but he would have known coming to that meeting, I thought, Mr. Roberts, because it says, for example, Mr. Roberts told the May 5th meeting participants the application would be named pie and the like. So, I thought Mr. Roberts must have known these things before he told them to the others. So, he told the other people this at the May 5th meeting, and the people at the May 5th meeting are there because they're going to do a consulting project, right? Well, what the complaint says, it seems to indicate that, again, that there were actually two things going on, right? They say, well, there was the MNDA about one consulting project, and then there was this breakfast, casual conversation in the middle of an industry hotel meeting where he blurted out, here's our great idea with the minimal information and a few data points. But this was – it's during the May 5th meeting, not – that he told the people who were working, who had already said, hey, we're going to maybe come on board to work on this, right? No. So, let me clarify. That's what I understand the complaint to say. So, you can clarify. Sure. So, there was Vailen Consulting Group, which was helping with AmFed, right? That's on one side. Right. Okay. Then you have this May 5th meeting, right? And at this meeting, which is not a whiteboard and a CTO and a COO and everybody going through technical details of anything. It's in the middle of an industry convention, right, at the Grand Cypress Hotel during the NCII Annual Insurance Symposium. Sit down, they have breakfast, and Mr. Roberts tells them, hey, I'd love to create a business, you know, an insurance on an app using minimal information and a few data points using a few various but unnamed data sources. I guess I don't understand why the fact that it's at a busy hotel, if they're already in a confidential agreement, AmFed and Vailen, who signed the 2016 NDA, and it's the people who are the officers of AmFed, why that's not part of their confidential relationship. Right. Well, so there's two points here, but the most, okay, so that goes to the reasonable measures. The key question, whether or not they took reasonable measures, that remains the question of whether there's a trade secret pledge. So they're sort of two different, right? It seems like you're pivoting, because it would seem that if you talk to people at a meeting, it's just them. And it's their people who are already the officers who are subject to the companies who are subject to the NDA. You would assume you could talk to them about what you're doing. Well, you could, except that the contract that you had, this NDA that you're purportedly relying on, is not with PyDev, right? It's with a totally different entity. So it doesn't cover this. It's just, that's the issue, right? Under the DTSA, the owner of the trade secret has to take the reasonable measures. That's PyDev. PyDev is not party to this contract, as they've admitted at AOB 37. They have no contract with anyone. Right, but Craig told them, according to this, right? If it is a secret thing. Am I wrong on that? No, I mean, I don't think you're wrong on that, Your Honor. I think that's the allegation, that they disclose this thing that we say is not secret. That's the whole ballgame bit. Is it secret or is it not, and is there enough to say it's secret? That is certainly the strongest and the heart of the question, Your Honor. Correct. Thank you. All right, Mr. Kimball. Thank you, Your Honor. The pleading standard that counsel opposite is advocating here bears no resemblance to a short, plain statement of a claim indicating a pleader is entitled to relief. What he's advocating appears to go beyond even Rule 9 pleading standards. I think if you look at the complaint and what we've pled, we've certainly met the requirement of a short, plain statement indicating the pleader is entitled to relief. Again, Rule 8 says no technical form is required. In terms of the NDA that keeps being referenced here, the NDA was signed just a few months before this May 5th meeting. Despite what counsel opposite says, there's no characterization in the complaint that this meeting was casual. Indeed, based on the complaint, there could have been a lot of detail given in this meeting, and I believe there was. But with regard to the NDA, I think an important point to consider is Vallon did the predictive analytics referenced in that paragraph, and they also simultaneously, as alleged, performed the work for the Thai trade secret. Now, if you look at Vallon's NDA, the Vallon NDA, and it's in the record, it's 74, it is as protective of Vallon's trade secrets, Vallon's ideas, Vallon's internal processes, as it is of Vallon's clients. What's extraordinary about it is it doesn't apply – yeah, it absolutely protects Vallon, but it doesn't apply to AmFed. It applies to the insurance company, not to the subsidiary, the relevant subsidiary, and it certainly doesn't apply to PiDev. So that's why – Well, AmFed – Go ahead. I'm sorry. Well, AmFed related the Pi trade secret to Vallon. I mean, Vallon, whether it was an NDA between Pi Development and Vallon or AmFed, which is both a parent company and then another AmFed is a sister company, there was still an obligation under that to keep the trade secret secret. Why haven't you alleged a violation of the NDA? We did. I mean, we didn't raise a claim based on the violation of the NDA, but we believe that goes into the claim in terms of foreseeable measures that were taken to keep the trade secret secret. But, no, we didn't assert – Why not? I mean, isn't that your best option? One of your best options? Like, they flat out violated the NDA. We felt that our best option for violation of the NDA was to use it in support of our trade secret claim. But you waited for years to do that and then never alleged it. I mean, as I take it, it's actually even stronger than the chief just suggested because you concede that the NDA doesn't actually apply to these parties. That's the way I read your brief. No, Your Honor. I mean, respectfully, I believe that we have always taken the position that the NDA applied to the pie trade secret. Mr. Swigert was under the obligation to comply with that NDA, and this was related from AMFED to Mr. Swigert, who was an employee of Valin at the time, to keep this trade secret a secret. Swigert or Craig? I'm sorry. Craig. My apologies. My apologies. I didn't see anything about any – did you really assert in your brief that we are still going after Mr. Swigert, too? Yes, Your Honor. We stated in our issues that we are appealing the dismissal of all the trade secret claims. You didn't really discuss Mr. Swigert. Well, I don't – I think we did discuss Mr. Swigert in the context of what we had to prove with respect to his knowledge that Mr. Craig had stolen the trade secret. And again, as I mentioned earlier, knowledge even under Rule 9 can be pled generally, and his exact knowledge we would not be able to determine until we've had the opportunity to engage in some discovery. Counsel, do you have a single case from the Fifth Circuit – and actually, I'll give you – I'll make it easier. Do you have a case from any court in the United States that says a party can get leave to amend a complaint without requesting it first in the district court? Well, Your Honor, we addressed – we did address the decisions that the defendants raised on this point. In those decisions, as I read Lopez, and what we argued is those cases pertain to jurisdictional issues. Whether a party could appeal, and this court would have jurisdiction on the basis of a conditional order, and this court concluded that they could. And I found, you know, nothing indicated – this court's ability to allow that sort of relief was in any way prohibited. We have held, quote, a party who reflects to ask the district court for leave to amend cannot expect to receive such a dispensation from the Court of Appeals. We held in a published opinion from 2003. We've applied it multiple times to parties in a similar situation who seem to try to use the appeal of a motion to dismiss to get two bites at the apple, as your friend on the other side said it. And we've said no every time that I can tell. So that's why I was asking if you can think of a case where we have given the second bite. Your Honor, I believe under the circumstances of this case and the delays that we were having to endure that this was a practical way of approaching the problem. Any further questions? That will conclude your argument today. The two cases that we heard are under submission. Thank you for your arguments, counsel. Thank you, Your Honor. Thank you, Your Honor.